818 March 24, 2016 No. 18

IN THE SUPREME COURT OF THE
STATE OF OREGON

Michael J. NEARMAN
and James L. Buchal,
*Petitioners,*

*v.*

Ellen ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(SC S063787) (Control)

Andrea MILLER,
*Petitioner,*

*v.*

Ellen ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(SC S063789)

En Banc

On petitions to review ballot title filed January 5, 2016; considered and under advisement February 23, 2016.

James L. Buchal, Murphy & Buchal LLP, Portland, filed the petition and reply for petitioners Michael J. Nearman and James L. Buchal.

Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter, P.C., Portland, filed the petition and reply for petitioner Andrea Miller.

Denise G. Fjordbeck, Assistant Attorney General, Salem, filed the answering memorandum for respondent. With her on the answering memorandum were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Gregory A. Chaimov, Davis Wright Tremaine LLP, Portland, filed the memorandum for *amici curiae* David Rogers, Rev. Joseph Santos-Lyons, and Kayse Jama.

BREWER, J.

The ballot title is referred to the Attorney General for modification.

**BREWER, J.**

Petitioners seek review of the Attorney General's certified ballot title for Initiative Petition 51 (2016) (IP 51), arguing that the ballot title does not satisfy the requirements of ORS 250.035(2). This court reviews a certified ballot title to determine whether it substantially complies with the requirements of that statute. ORS 250.085(5). For the following reasons, we refer the ballot title to the Attorney General for modification.

IP 51 is a proposed constitutional amendment that, if adopted by the voters, would change current voter registration methods for federal, state, and local elections in Oregon by requiring in-person registration, thereby eliminating "motor-voter," online, and mail registration options. Its passage also would result in the expiration within 10 years of all current Oregon voter registrations and establish other new requirements that must be satisfied in order for Oregonians to register to vote.

IP 51 has four sections. Section (a) provides that "[p]roof of United States citizenship shall be required to register to vote in all elections in the State of Oregon." Section (b) requires a prospective voter to present one or more of an exclusive list of "documents or records" that constitute proof of United States citizenship sufficient to register to vote in Oregon. *Id*. § (b)(i) - (x). Section (b) further provides that, if an applicant certifies to the Secretary of State that the applicant does not have any of the specified documents, the Secretary of State shall ask the United States Immigration and Naturalization Service (INS)[1] to "verify the applicant's citizenship status." *Id*. § (b)(xi). The federal agency's determination would be controlling. *Id*. If the federal agency fails to respond, the applicant may offer evidence of his or her citizenship status in a contested case hearing before the Secretary of State. IP 51, § (b)(xi). Section (c) provides that

---

[1] The United States Immigration and Naturalization Service (INS) was a component of the U.S. Department of Justice from 1933 to 2003. In 2003, many of that body's functions were transferred to U.S. Citizenship and Immigration Services, a then-new component of the United States Department of Homeland Security. We express no opinion here with respect to the effect, if any, of the measure's references to INS.

all existing voter registrations will expire 10 years after the measure passes, unless a voter registration is "renewed" in accordance with the proof of citizenship requirement prescribed by section (a). Section (d) requires the State of Oregon to provide, without charge, a replacement birth certificate for the purpose of voter registration to any Oregon resident born in Oregon.

The Attorney General certified the following ballot title for IP 51:

> **"Amends Constitution:   State Election Registration Requires In-Person Registration, Specific Citizenship Documents/ Verification/ Hearing; Voter Registrations Expire**

> **"Result of 'Yes' Vote:**   'Yes' vote requires registration for state/local elections in person with specified citizenship documentation or immigration verification/hearing. Current voter registrations expire after ten years.

> **"Result of 'No' Vote:**   'No' vote continues the current system allowing in person, online, mailed voter registration for all elections with attestation of citizenship. Voter registrations do not expire.

> **"Summary:**  Amends Oregon Constitution. Under current law, voters may register by submitting registration card online/ by mail/ in person; voter must attest United States citizenship. Felony criminal penalties for providing false attestation. Effective January 1, 2016, Driver and Motor Vehicle Division (DMV) will submit information received from customers to Secretary of State; if information demonstrates citizenship, customer will be registered to vote unless opts out. Proposed measure requires in-person voter registration proving citizenship with specified documents only; if specified documents are unavailable, federal Immigration and Naturalization Service or an administrative hearing required. Proposed measure conflicts with federal voter registration laws, applies only to state/ local elections. Current voter registration expires ten years after proposed measure passes; to vote, current voters need to re-register. Other provisions."

Nearman and Buchal, chief petitioners, and Miller, a commenter, seek review of the ballot title certified by the Attorney General. Chief petitioners object to the caption and

summary for the ballot title. Petitioner Miller objects to the caption, "yes" result statement, and summary. We begin with chief petitioners' related arguments about the caption and summary.

Chief petitioners object to the caption on the ground that it does not reasonably identify the subject matter of IP 51, insofar as it purports to limit its scope and effect to state and local elections. Relatedly, they assert that the summary incorrectly states that IP 51 conflicts with federal law and only applies to state and local elections.

The caption for the ballot title of a state measure must contain no more than 15 words and reasonably identify the "subject matter" of the measure, which is "the actual major effect of a measure or, if the measure has more than one major effect, all such effects (to the limit of the available words)." *McCann/Harmon v. Rosenblum*, 354 Or 701, 706, 320 P3d 548 (2014) (internal quotations marks omitted; citations omitted); *see* ORS 250.035(2)(a).

ORS 250.035(2)(d) provides that a ballot title summary shall be "[a] concise and impartial statement of not more than 125 words summarizing the state measure and its major effect." The function of the summary is "to provide voters with enough information to understand what will happen if the measure is approved." *Caruthers v. Kroger,* 347 Or 660, 670, 227 P3d 723 (2010). The information must pertain to an identified, actual "effect" of enacting or adopting the proposed measure; it is not permissible to "speculate about the possible effects of a proposed measure." *Pelikan/Tauman v. Myers*, 342 Or 383, 389, 153 P3d 117 (2007).

In this case, chief petitioners argue that the caption and summary fail to meet those standards because, by its terms, IP 51 applies to federal elections as well as state and local elections, and the caption and summary fail to state that it applies to federal elections. According to chief petitioners, the Elections Clause of the United States Constitution allows the states to specify who is qualified to vote in federal elections, the measure falls within the ambit of that authority and, thus, the measure does not conflict with federal law.

*See* US Const, Art I, § 4, cl 1 (stating responsibility for times, places and manner of elections).[2]

The Attorney General defends the caption and summary on the ground that "the requirements of the proposed measure conflict with, and are preempted by, the National Voter Registration Act (NVRA), as construed by the United States Supreme Court." According to the Attorney General, the Elections Clause authorizes the State of Oregon to specify—as it has done—that only United States citizens may vote. *See* Or Const, Art II, § 2 (so describing qualification of electors). However, the Attorney General notes, because Congress may specify the "[t]imes, [p]laces and [m]anner of holding [e]lections," US Const, Art I, § 4, cl 1, the substantive scope of those words is broad enough to encompass "authority to provide a complete code for congressional elections, including*** regulations relating to registration." *Arizona v. Inter Tribal Council of Ariz., Inc.,* ___ US ___, 133 S Ct 2247, 2253, 186 L Ed 2d 239 (2013) (*Inter Tribal*) (ellipsis added; internal quotation marks and citations omitted). Because, under *Inter Tribal*, the Elections Clause invests the states with authority over federal elections "only so far as Congress declines to pre-empt state legislative choices," *id.*, the Attorney General opines that IP 51 is inconsistent with—and therefore preempted by—the NVRA.

The thread of the Attorney General's argument is more detailed. She notes that, in the NVRA, Congress has chosen to allow citizenship to be shown by attestation, rather than by documentary proof. *See* 52 USC § 20508(b)(2)(B). The stated Congressional purposes of the NVRA are to protect the integrity of the electoral process and enhance and increase voter participation in federal elections, which includes discouraging unfair or discriminatory registration laws and procedures that have a damaging effect on voter participation. 52 USC § 20501(a)(2) - (3), (b)(1) - (3). The NVRA requires each state to establish a procedure for

---

[2] Article I, section 4, clause 1 provides:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators."

federal elections that allows applications to be made by driver license application, mail application, or in-person application. 52 USC § 20503(a). To accomplish those objectives, the federal Election Assistance Commission (EAC) is required to develop, in conjunction with the states, a "federal mail voter registration application form." 52 USC § 20508(a)(2). Each state is required to "accept and use" the federal form. 52 USC § 20505(a)(1). The NVRA allows a state to request that the EAC approve instructions for the federal form to comport with the state's voter qualification requirements, but at least one federal court of appeals has held that the EAC is under no obligation to approve the use of such instructions. *See Kobach v. U.S. Election Assistance Com'n*, 772 F3d 1183, 1194-96 (10th Cir 2014), *cert den*, __ US __, 135 S Ct 2891 (2015). The court in *Kobach* held that, absent evidence that attestation is insufficient to ensure that noncitizens do not vote, the EAC lawfully may deny a state's request that requires documentary proof of citizenship. *Id*. at 1196-97.

Based on the foregoing authorities and reasoning, the Attorney General asserts that

> "in the absence of EAC approval of state-specific instructions for the federal form, IP 51 will create a dual system of voter registration: Registration for federal elections using the federal form requiring attestation of citizenship, and registration for state elections requiring in-person presentation of specific documentation of citizenship, or, absent such documentation, INS verification or a contested case hearing before the Oregon Secretary of State."

The Attorney General asserts that "[i]t is not only entirely speculative, but also wholly unlikely, that the EAC will approve Oregon-specific instructions that are contrary to the NVRA's purpose and language." It follows, the Attorney General urges, that the certified ballot title correctly states that, if adopted, IP 51 would apply to only state and local elections.

Chief petitioners dispute the Attorney General's arguments. Among other arguments, they assert that the Attorney General has misinterpreted the United States Supreme Court's decision in *Inter Tribal*. Chief petitioners

point out that the majority in that case "noted that there would be 'serious constitutional doubts' as to the lawfulness of the NVRA if it 'precluded a state from obtaining information necessary to enforce its voter qualifications' and * * * that the 'power to establish voting requirements is of little value without the power to enforce those requirements.' " (Quoting *Inter Tribal*, 133 S Ct at 2258-59.) To reinforce the point, chief petitioners rely on a recent letter from the Executive Director of the EAC reporting that the EAC accepted a request from the State of Kansas that the national voter registration form be modified to add instructions that an application must "have provided a document, or copy thereof, demonstrating United States citizenship within 90 days of filing the application with the secretary of state or applicable county election officer." According to chief petitioners, that letter demonstrates that there is "no inherent inconsistency" between IP 51 and federal law.

The parties' disagreement about the effect of federal election law on IP 51 is an interesting one, but we ultimately conclude that it is not a matter that is properly before us at this stage of the measure's life cycle. To explain why, it is helpful to consider several of this court's previous decisions that have addressed similar issues.

In the past, this court often stated that determinations of the constitutionality of a proposed measure are not within the scope of the ballot title certification process.[3] In *Kane v. Kulongoski*, 320 Or 273, 277-78, 882 P2d 588 (1994), this court applied that principle to a ballot title challenge that was based on the asserted preemption of the subject of the measure by federal law. The petitioner there asserted that the measure was "unconstitutional because, if passed, it would purport to allow Oregonians to grow, process, and sell marijuana, while federal law specifically criminalize[d] such conduct." *Id*. at 277. It followed, the petitioner argued, that the measure violated the Supremacy Clause of the United States Constitution.

---

[3] *See, e.g., Dunagan v. Thornton*, 237 Or 379, 380, 391 P2d 783 (1964) (so holding under *former* ORS 254.080 (1963), under which this court was responsible for certifying ballot titles to the Secretary of State); *Johnson v. City of Astoria*, 227 Or 585, 591, 363 P2d 571 (1961) (same).

This court rejected that challenge:

"Whether or not petitioner's argument in this regard is well founded in law, our precedents make clear that this court will not address it at this stage in the initiative process. *See*, *e.g.*, *Hand v. Roberts,* 309 Or 430, 436, 788 P2d 446 (1990) (court not authorized to assess 'legality' of proposed ballot measure in the context of a ballot title review).

"Although petitioner makes the foregoing argument under the heading, 'The Measure is Unconstitutional,' petitioner argues another proposition, as well. Petitioner says: 'The measure is in direct conflict with federal law *** [, y]et no part of the challenged ballot title refers to the conflict between the measure and federal law.' Enactment of the proposed measure, petitioner argues, would 'expose' those who acted in conformance with it 'to prosecution under federal law.' A ballot title, petitioner asserts, 'should disclose an obvious conflict between an initiative measure and federal law.'

"That argument, although dressed up slightly differently, does not really differ from the unconstitutionality argument: It is an attempt to have inserted into the ballot title a warning to the effect that the proposed measure creates serious legal difficulties and questions. So understood, petitioner's argument offends both the rule that this court does not address the legality of a proposed measure in these proceedings, *Hand v. Roberts, supra,* and also the requirement that a ballot title not take sides for or against a proposed measure. *Id.* at 433 (ballot title 'should provide accurate and neutral information to the voters, not an additional opportunity for proponents or opponents to persuade')."

*Kane*, 320 Or at 277-78 (ellipsis and first alteration in original; footnote omitted).

More recently, this court has refined and, indeed, retreated from the seemingly categorical stance that it took in *Kane* and earlier cases. We have recognized, for example, that the Attorney General has authority to engage in basic interpretation of a measure to identify its subject or determine its major effect and, in so doing, to consider the "changes that the proposed measure would enact in the context of existing law." *Rasmussen v. Kroger*, 350 Or 281, 285,

253 P3d 1031 (2011). As this court stated in *Christ/Tauman v. Myers*, 339 Or 494, 500, 123 P3d 271 (2005),

> "[t]he statutory framework in which the Attorney General performs the ballot title preparation function may deny the Attorney General the right to speculate as to a proposed initiative measure's meaning, where two or more reasonable interpretations are possible. But the statutory standards in ORS 250.035(2)(*a*) (requiring Attorney General to prepare caption 'that reasonably identifies the subject matter' of the proposed measure); (2)(*b*) (requiring a 'simple and understandable statement *** that describes the result if the state measure is approved'); (2)(c) (requiring a 'simple and understandable statement *** that describes the result if the state measure is rejected'); and (2)(d) (requiring a statement 'summarizing the state measure and its major effect') all require a degree of interpretive effort by the Attorney General. *See, e.g., Kain/Waller v. Myers*, 337 Or 36, 93 P3d 62 (2004) (interpreting ORS 250.035(2)(a) and (b), and illustrating proposition). The Attorney General should not in the future rely on apparently contrary statements from our older decisions. Instead, the Attorney General must recognize that his or her statutory obligation includes a certain amount of basic interpretation including, in this case, an independent assessment of what the proposed initiative measure in this case *is*—statutory enactment or constitutional amendment. He or she must make that identification in order to inform potential signers of the initiative petition as to what the 'practical effect' of the proposed measure will be if it is adopted."[4]

(Emphases in original).

*Christ/Tauman* did not involve an assertion that a proposed measure was unconstitutional, that it was preempted by federal law, or that it otherwise was unlawful. Instead, the question there was whether the Attorney General should have interpreted a ballot title so as to determine and

---

[4] The older cases to which the court referred in *Christ/Tauman* were "*Kouns v. Paulus,* 296 Or 826, 828, 680 P2d 385 (1984) (not Attorney General's role in ballot title process to interpret words of proposed measure); *Hand v. Roberts,* 309 Or 430, 438, 788 P2d 446 (1990) ('[t]his court *** assiduously attempts to avoid deciding questions of the practical effect of initiative *** measures in its review of a certified ballot title'); and *ACLU v. Paulus,* 282 Or 539, 544, 580 P2d 168 (1978) (inappropriate for Attorney General to speculate on meaning of wording of the proposed measure)." *Christ/Tauman*, 339 Or at 500 n 3.

indicate whether the proposed measure would amend the Oregon Constitution or have the force of a statute. The court concluded that making that determination was part of the Attorney General's obligation to reasonably identify the subject of the measure. *Id.* That conclusion was not, itself, at odds with the holding in *Kane.* As this court later explained, *Christ/Tauman*

> "underscores the obvious point that, although neither this court nor the Attorney General may speculate about the possible secondary effects of a proposed measure or adopt one of several plausible interpretations of the measure for purposes of the ballot title, the preparation of a ballot title necessarily requires some level of interpretation of the measure."

*Wolf v. Myers*, 343 Or 494, 501, 173 P3d 812 (2007).

However, this court went further in *Caruthers v. Myers*, 344 Or 596, 189 P3d 1 (2008). In that case, we considered whether the Attorney General could go beyond the words of a measure to interpret and describe its subject matter or its effects, where the measure undisputedly conflicted with federal law. *Id.* at 601-03. The proposed measure in *Caruthers* would have changed Oregon law to provide, among other things, that "no union shall be required to represent or bargain for an employee who chooses not to be a member of the union." *Id.* at 598 (internal quotation marks omitted). However, the petitioner argued, and this court agreed, that "settled federal law requires a private sector union to represent all the employees in a bargaining unit and that that federal requirement will continue to apply notwithstanding any changes that the proposed measure might make to state law." *Id.* at 599. The court concluded:

> "Not only is the law settled but its application here is clear. Under settled law, the proposed measure would have no effect on a private sector union's federal obligation to represent all the employees in a bargaining unit."

*Id.* at 601.

Based on that interpretation, the court concluded that the ballot title improperly failed to place the proposed measure "in the context of existing law." *Id.* (internal

quotation marks and citations omitted). In doing so, the court distinguished an earlier decision:

> "In *Sizemore* [*v. Myers,* 326 Or 220, 953 P2d 360 (1997)]*,* this court held that the ballot title in that case need not discuss the effect that a proposed constitutional amendment to prohibit regional governments would have on Oregon's constitutional home rule provisions. 326 Or at 231. The court reasoned that discussion of that issue 'would require extensive legal interpretation, not only of the proposed initiative measure, but also of the interaction of the initiative measure with other constitutional provisions.' *Id.*
>
> "This aspect of the case does not present the same problem that concerned the court in *Sizemore.* In *Sizemore,* the relationship between the proposed measure and existing law was complex and unresolved. Here, the relationship between the proposed measure and existing federal law is straightforward and settled. When petitioners objected to the Attorney General's proposed ballot title on the ground that, under settled federal law, the effect of the measure would be more limited than the ballot title explained, *Sizemore* provided no basis for avoiding the Attorney General's obligation to describe the proposed measure accurately."

*Caruthers*, 344 Or at 601-02.

This case is not as clear-cut as *Caruthers*. Although the Attorney General's federal preemption analysis has force, it is neither undisputed nor—in light of the parties' competing arguments and submissions—a settled issue. The question whether the State of Oregon could succeed in obtaining permission from the EAC to use a federal election registration form that requires documentation of citizenship rather than attestation by an applicant is sufficiently complex and uncertain that we conclude that this ballot title proceeding does not furnish an appropriate opportunity to answer it. *See McCann v. Rosenblum*, 355 Or 256, 264, 323 P3d 955 (2014) (holding that, where constitutionality of ballot title provision was uncertain, Attorney General appropriately declined "to factor those complex legal determinations into her description of the measure's effects," and comparing *Sizemore*, 326 Or at 231 (declining to engage in extensive contextual legal interpretation), with *Caruthers*, 344 Or at

601 (referring for modification when the legal effect was undisputed)).

We therefore conclude that, in stating that the application of IP 51 is limited to "state and local" elections, the Attorney General's caption does not substantially comply with the requirement in ORS 250.035(2)(a) that the caption reasonably identify the subject of the proposed measure. In addition, the summary fails to state a major effect of the measure because it does not state that, by its terms, the measure applies to federal elections. Accordingly, both the caption and the summary must be modified to identify that subject and major effect.

We turn to petitioner Miller's challenge to the "yes" result statement. She asserts that the reference in that statement to "immigration verification" is inaccurate and misleading. Petitioner Miller argues that "immigration" is immaterial to IP 51 and that the word therefore should not appear in the ballot title, because "[o]nly United States citizens who are Oregon residents can vote in Oregon elections." *See* Or Const, Art II, § 2, cl 1. As explained below, we agree.

The "yes" and "no" result statements are required to describe the results of approving and rejecting a proposed measure. The statements are limited to 25 words. ORS 250.035(2)(b) - (c). A "yes" vote result statement must accurately describe "in simple and understandable terms * * * the result if a proposed measure is approved." *Mabon v. Myers*, 332 Or 633, 639, 33 P3d 988 (2001); *see* ORS 250.035(2)(b).

As noted, the "yes" vote result statement prepared by the Attorney General states:

> '"Yes' vote requires registration for state/ local elections in person with specified citizenship documentation or *immigration verification*/ hearing. Current voter registrations expire after ten years."

(Emphasis added). Nothing in IP 51 establishes requirements for immigrants or involves an inquiry as to whether an immigrant is properly documented for residency in Oregon. The measure addresses only the documentation that a United States citizen must provide to register to vote or how an applicant's citizenship otherwise must be verified for

registration purposes. Accordingly, the reference to "immigration verification" is inaccurate and misleading, and the "yes" vote result statement must be modified to remove it.

Chief petitioners Nearman and Buchal and petitioner Miller also make related objections to the summary that require brief discussion. In particular, they each object to the description of current law in the fourth sentence of the summary on the ground that it is confusing and inaccurate. That sentence begins: "*Effective January 1, 2016*, Driver and Motor Vehicle Division (DMV) *will* submit information received from customers to Secretary of State; *if information demonstrates citizenship*, customer will be registered to vote unless opts out." (Emphasis added). The quoted reference is to the January 2016 effective date of the newest "motor-voter" enactment, Or Laws 2015, ch 8. Under that provision, the Secretary of State is required by rule to supply a schedule for the Department of Transportation to provide electronic records, including "citizenship information," for "each person who meets qualifications identified by the secretary by rule." Or Laws 2015, ch 8, § 1(1) (creating amended ORS 247.017(1)).

Petitioner Miller correctly observes that IP 51 could not be circulated for signatures, much less submitted to voters, until sometime after January 1, 2016. She asserts that the prospective wording is misleading and would be confusing to potential petition signers and voters. Chief petitioners object to the prospective description of current law because they assert that the Secretary of State has no procedure in place to comply with Or Laws 2015, ch 8, and that the reference to its enactment incorrectly suggests that current law provides adequate means of assuring elector citizenship, whereas chief petitioners think that it does not.

We agree that petitioner Miller's objection is well taken, and, to the extent that chief petitioners' objection has merit, it is for the same reason: The "[e]ffective January 1, 2016, *** (DMV) will submit" wording in the summary is misleading; the potential for confusion can be remedied without adding to the length of the summary by changing "will submit" to "must submit." We agree with the Attorney General, however, that the summary appropriately

cross-references Or Laws 2015, ch 8, because that accurate reference to that law permits a voter to assess a major effect of IP 51—its in-person voter registration requirement—on current law. *See Berman v. Kroger*, 347 Or 509, 514, 225 P3d 32 (2009) (summary may include description of effect of measure on other laws, so long as description is accurate).

Petitioner Miller also objects to the phrase in the summary that, "if specified documents are unavailable, federal Immigration and Naturalization Service or an administrative hearing required." Petitioner Miller asserts that that phrase is confusing and misstates the scope of section (b)(xi) of the measure. We agree. A voter or potential petition signer reading the phrase "federal Immigration and Naturalization Service or an administrative hearing required" reasonably would infer that IP 51 requires some form of hearing before a federal agency when, in fact, the measure contains no such requirement. Similarly, that phrase fails to inform voters and potential petition signers that the measure requires the Secretary of State to conduct a contested case hearing only if the applicant pursues the matter. For that additional reason, the summary must be revised.

Chief petitioners and petitioner Miller advance other arguments, which we reject without discussion.

The ballot title is referred to the Attorney General for modification.